UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL ALAN BROWN,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 17-cv-02834-JCS

**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 25

## I.    INTRODUCTION

Plaintiff Paul Alan Brown brought this action seeking judicial review of the final decision of Defendant Nancy Berryhill, Acting Commissioner of Social Security (the "Commissioner") denying Brown's application for supplemental security income under Title XVI of the Social Security Act.  Brown argues that an administrative law judge ("ALJ") committed reversible error when he improperly evaluated the medical evidence in the record, Brown's credibility, and Brown's residual functional capacity.  Brown further argues that the ALJ erred when he failed to obtain expert testimony and relied on the Medical-Vocational Guidelines (sometimes referred to as "grids").  The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons stated below, Brown's motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED for further administrative proceedings in accordance with this order.[1]

## II.    BACKGROUND

### A.    Procedural History

On October 31, 2013, Brown applied for supplemental security income for alleged

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

disability beginning on January 1, 2013. Administrative Record ("AR," dkt. 13) 56. Brown's claims were initially denied on February 28, 2014, and they were denied upon reconsideration on May 29, 2014. *Id.* at 83–87, 91–96. Brown filed a written request for a hearing before an ALJ on June 19, 2014. *Id.* at 98. A hearing was held on May 25, 2016. *Id.* at 39–54. Brown appeared by phone before ALJ David R. Mazzi because he did not have a current form of identification and therefore was unable to enter the building. *Id.* at 22, 39. Brown was represented by Jessica Redditt, an attorney, who appeared in person at the administrative hearing and continues to represent him before this Court. *See id.* at 39. Impartial vocational expert Jeff Beeman, M.Ed., ("VE Beeman") also appeared by telephone and testified at the hearing. *Id.* On September 12, 2016, the ALJ issued an unfavorable decision, finding that Brown was not disabled under § 1614(a)(3)(A) of the Social Security Act. *Id.* at 22–32. Brown requested review of the ALJ's decision, which the Social Security Administration Appeals Council denied on March 14, 2017, "finding no reason under [its] rules to review [the ALJ's] decision." *Id.* at 1–3. Brown filed a complaint on May 17, 2017, seeking judicial review by this Court. Complaint (dkt. 1) at 2. Pursuant to Civil Local Rule 16-5, Brown filed a motion for summary judgment, and the Commissioner filed a cross-motion for summary judgment. *See* Brown's Mot (dkt. 20); Comm'r's Mot. (dkt. 25).

### B. Brown's Background

#### 1. Personal History

Brown's mother died in a car accident when Brown was two years old. AR 410. After his mother's death, Brown and his father moved in with his grandparents, who lived in Hayward, California. *Id.* Brown's father as well as his grandparents died when was seventeen years old. *Id.* Following their death, Brown lived in three foster care homes until he was eighteen years old, at which point he lived with his uncle for a short period of time. *Id.* He was then homeless between the ages of eighteen and twenty. *Id.* Brown dropped out of high school in the eleventh grade, but he has obtained his general equivalency diploma. *Id.* He has one half brother and two half-sisters. *Id.* Brown is not married, and he does not have any children. *Id.*

### 2. Medical and Legal History

Brown sustained a traumatic brain injury at the age of four when he was hit by a car. *Id.* He also sustained a head injury when he was nine years old "when he was hit in the forehead by a rock while playing with friends." *Id.* Brown has also "suffered numerous head injuries from fighting and being jumped." *Id.* at 275.

Brown has a history of substance abuse as well as mental health issues. *Id.* at 410–11. He has been arrested and taken to the Washington Hospital Healthcare System's emergency department as well as the John George Psychiatric Pavilion for injuries and behavioral incidents related to alcohol intoxication, including incidents that involved combative or suicidal behavior. *See, e.g.*, *id.* at 331, 350–52, 365–71, 369, 532–39. Brown began to experience psychiatric symptoms following the deaths of his father and his grandparents when he was seventeen years old. *Id.* at 410. Brown suffers from depression and anxiety. *Id.* at 419. He also exhibits antisocial personality traits and has reported experiencing auditory hallucinations. *Id.* at 419, 518. Brown's "legal history includes petty theft, strong armed robbery, drunk in public, public intoxication, and a DUI." *Id.* at 410.

#### a. Willow Rock Center: February and May 2009

Brown was admitted to Willow Rock Center in San Leandro, California, in February and May of 2009. AR 252–53, 256–259. In February 2009, Brown was admitted for "new onset psychosis." *Id.* at 252. Natalie Aitchinson, M.D., noted that on admission, Brown was "very agitated, paranoid, delusional," and "made threats on the unit stating the staff has sexually molested him." *Id.* Later in his stay and following a change in medication, Dr. Aitchinson found that Brown "became somewhat less delusional, although he still appeared to be responding to internal stimuli and had thought blocking." *Id.* In May 2009, Brown was admitted to Willow Rock after having gotten into a physical altercation with his uncle while intoxicated. *Id.* at 257. David Camenisch, M.D., noted that Brown was not compliant with his medication, but he also noted that Brown did "not give an indication of recurrence of psychosis at this time." *Id.* at 256.

#### b. Ahmed El-Sokkary, Psy.D.

Ahmed El-Sokkary, Psy.D., examined Brown on August 23, 2010. *Id.* at 274–76. Dr. El-

Sokkary performed a mental status exam, the Wechsler Adult Intelligence Scales, Third Edition

("WAIS-III"), the Wechsler Memory Scale, Third Edition ("WMS-III"), and the Bender Visual

Motor Gestalt Test, Second Edition ("Bender-Gestalt Test"). *Id.* With respect to Brown's mental

status exam, Dr. El-Sokkary found that Brown was "withdrawn and appeared to be internally

preoccupied." *Id.* at 274. He noted that Brown "reported feeling confused and drowsy" and that

Brown's "affect was flat." *Id.* Dr. El-Sokkary also determined that Brown's mental status exam

showed that Brown had an "underproductive thought process." *Id.* at 275. Dr. El-Sokkary noted

that Brown's WAIS-III Full Scale IQ was 77, which was in the "Borderline range." *Id.* at 275.

With respect to the WMS-III, Dr. El-Sokkary indicated that Brown's "spatial span forward,

backwards, and letter number sequencing results were all below normal limits." *Id.* Concerning

the Bender-Gestalt Test, Dr. El-Sokkary found that Brown's performance "suggested normal

visual motor integration abilities that are within the high average range." *Id.* at 256–57. On Axis

I,[2] Dr. El-Sokkary diagnosed Brown with: (1) "Psychotic Disorder, nos"[3]; (2) "Mood disorder,

---

[2] The court in *Nguyen v. Astrue* explained physicians' diagnoses based on this system as follows:

> The American Psychiatric Association's Multiaxial Assessment is set
> forth in the Diagnostic and Statistical Manual of Psychiatric
> Disorders, ("DSM-IV") (4th Ed. 2005), at pp. 23–37:
> Axis I: Clinical Disorders
>    Other Conditions That May Be a Focus of Clinical Attention
> Axis II: Personality Disorders
>    Mental Retardation
> Axis III: Medical Conditions
> Axis IV: Psychosocial and Environmental Problems
> Axis V: Global Assessment of Functioning ("GAF").
> The GAF Scale "[c]onsider[s] psychological, social, and occupational
> functioning on a hypothetical continuum of mental health-illness."
> *Id.* at 34.

No. CIV S-07-1372 (EFB), 2009 WL 747321, at *4 n.9 (E.D. Cal. Mar. 20, 2009). *See also
Salazar v. Colvin*, No. C-11-03840 (RMW), 2014 WL 3728453, at *4 n.5 (N.D. Cal. July 28,
2014) (explaining in detail the "five axes in the DSM Diagnostic system" and how they "each
relat[e] to a different aspect of a mental disorder").

[3] "'NOS' is a short-form for the diagnosis of 'not otherwise specified.'" *Wright v. Astrue*, 624 F.
Supp. 2d 1095, 1103 n.3 (N.D. Cal. 2008). It "is a category for disorders that include
symptomatology . . . about which there is inadequate information to make a specific diagnosis or
about which there is contradictory information, or disorders with psychotic symptoms that do not
meet the criteria for any Psychotic Disorder." *Id.* (citing American Pyschiatric Association
Diagnostic and Statistical Manual of Mental Disorders 4th Ed., Section 298.9 (2000)).

nos"; (3) "R/O[4] Cognitive Disorder, nos"; and (4) "R/O Alcohol Related Disorder, nos." *Id.* at 276.

Dr. El-Sokkary concluded that, "[b]ased solely on the current evaluation and from a strictly cognitive and emotional standpoint, [Brown] demonstrated a limited capacity to understand, remember, and perform simple tasks." *Id.* He also concluded that Brown " struggled to maintain a sufficient level of concentration, persistence, and pace which indicates that he would have difficulty in a competitive work setting." *Id.* Lastly, Dr. El-Sokkary noted that Brown "struggled throughout the evaluation to adequately relate and interact" and, accordingly, concluded that Brown "therefore would have difficulty appropriately interacting with supervisors and co-workers at this time." *Id.*

### c. Santa Rita Jail: November 2010–August 2011

Brown has been incarcerated for brief periods of time at Santa Rita Jail, often on alcohol-related charges. *See* AR 426–27, 520–23, 529–31. For example, Brown's initial intake and screening form indicates that Brown exhibited aggressive behavior and was intoxicated due to alcohol consumption in early November 2010. *Id.* at 427. In another initial screening form from the same period of incarceration, Stacey Worgull, LCSW, a psychiatric social worker, noted that Brown "appeared distractable, made no eye contact," and exhibited a "tangential thought process." *Id.* at 435. Worgull further noted that Brown "appeared mildly ankeas [sic] about being in custody" and that he "appear[ed] vulnerable." *Id.* Worgull diagnosed Brown with "Pyschotic Disorder NOS versus R/O Cognitive Dis[order] NOS" and "Alcohol Abuse." *Id.* He was released two days later. *Id.* at 426. During these brief periods of incarceration, Worgull noted that Brown exhibited a slowed or distracted thought process. For instance, when Brown was reincarcerated in late December 2010, Worgull noted in an initial screening form that Brown "made little eye contact" and that he was "looking around fleetingly" as though he might be responding to "internal stimuli." *Id.* at 527. Worgull further noted that Brown's thought process was "slow" but "organized." *Id.* Worgull diagnosed Brown with "Psychotic Disorder NOS." *Id.*

---

[4] "R/O" is an abbreviation for "rule out." *See Cha Yang v. Comm'r of Soc. Sec.*, 488 F. App'x 203, 205 (9th Cir. 2012).

Jennifer Chaffin, M.D., saw Brown in late July 2011. *Id.* at 526. She noted Brown was "disoriented / disorganized" and that Brown "present[ed] as cognitively slowed," as Brown "ha[d] difficulty putting thoughts together." *Id.* Dr. Chaffin further noted that Brown informed her that he previously had taken medication that helped him focus and that he was willing to take medication at the time of the visit. *Id.* Dr. Chaffin diagnosed Brown with "Psychosis NOS—R/O Disorganized Schizophrenia vs Cognitive D[isorder] NOS" and "ETOH[5] Dependence." *Id.* Dr. Chaffin prescribed Risperdal. *Id.*

Bonnie Cook, LMFT, a marriage and family therapist, saw Brown in August 2011. *Id.* at 524. She noted that Brown was "calm and coop[erative]" and that Brown made "poor eye contact." *Id.* She further noted that Brown seemed "somewhat 'spacey'" in that he was "slow to organize [his] thoughts," but that Brown "communicated adequately." *Id.* Brown indicated that his medication was "working well" and, without it, he "has too many negative thoughts and gets out of control." *Id.* Cook noted that Brown last had access to medication two years earlier at John George Psychiatric Pavilion and that Brown has not had a "regular" medical doctor. *Id.*

### d. Villa Fairmont Mental Health Rehabilitation Center: August 2011

Brown was hospitalized for approximately two weeks at Villa Fairmont Mental Health Center ("Villa Fairmont") in San Leandro, California, in August 2011. *Id.* at 292. In Brown's discharge summary, Luisito M. Roxas, M.D., noted that Brown "did quite well during this hospitalization" and that there was "[n]o evidence of psychosis noted." *Id.* at 294. Dr. Roxas further noted that he discontinued Brown's prescription for Risperdal because of an elevated liver function test result. *Id.* Dr. Roxas reasoned that Brown's elevated liver function was not "consistent with alcoholic hepatitis since [Brown] has been sober for a while and liver function tests are also still going up instead of improving." *Id.* Accordingly, Dr. Roxas attributed Brown's elevated liver function test result to Brown's use of Risperdal. *Id.* Dr. Roxas noted that Brown had been diagnosed with "psychotic disorder NOS" on two occasions prior to Brown's

---

[5] "ETOH is the chemical abbreviation for ethyl alcohol or ethanol, the medical term for alcohol." *Patrick v. Devon Health Services, Inc.*, 828 F. Supp. 2d 781, 785 n.3 (E.D. Pa. 2011) (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1193 n.4 (11th Cir. 2010)).

hospitalization at Villa Fairmont. *Id.* Dr. Roxas found, however, that Brown's "diagnosis [wa]s not really clear yet" and that "it might be helpful for [Brown] to be off medication to help clear up his liver and also to clarify the diagnosis." *Id.* at 295.

### e. Fred Finch Youth Center: December 2011–January 2012

Brown was admitted to the Supportive Housing for Transition Aged Youth ("STAY") program at the Fred Finch Youth Center in Oakland, California, in December 2011. *Id.* at 376. A report from January 2012 indicates that Brown was studying to take the exam to obtain his general equivalency diploma. *Id.* at 380. The report also indicates that he "[v]olunteered while living at a homeless shelter program 'Hope for Love' where he stood outside stores and collected donations for the homeless." *Id.* at 381. In January 2012, Jeremiah Maller, CSW, conducted a mental status exam and found that Brown's cognition was impaired, his speech was slowed, his thought process was circumstantial, tangential, and rambling, and he exhibited a flight of ideas. *Id.* at 382. Additional risk factors included that Brown exhibited impulsive or threatening behavior and that Brown had a history of substance abuse. *Id.* at 383. On Axis I, Maller diagnosed Brown with "Psychotic D/O NOS" and "Alcohol Abuse in Early Full Remission." *Id.* He deferred diagnosis on Axis II. *Id.* He concluded that Axis III was not applicable to Brown's conditions, and he determined that Brown suffered from various psychological and environmental problems on Axis IV. *Id.* On Axis V, Maller determined that Brown had a GAF of 50, noting that Brown had previously had a GAF of 28 within the past year. *Id.* at 384. In his interpretive summary, Maller wrote that Brown's mental health symptoms have "present[ed] significant barriers to his functioning and have resulted in him experiencing chronic homelessness, unemployment, and frequent incarceration." *Id.* at 385. Maller indicated that Brown would benefit from "supportive services" and "psychotropic medication." *Id.*

### f. Santa Rita Jail: July 2012–November 2012

Seth Page, LMFT, a behavioral health clinician, saw Brown during a period of incarceration at Santa Rita Jail in 2012. *See, e.g.*, *id.* at 516, 518–19. Page noted that Brown was arrested in late July 2012 for resisting arrest and public drunkenness. *Id.* at 519. In July, Page noted that Brown was not on any "psychiatric medication [and] d[id] not want to be." *Id.* Page

further noted that Brown reported that Risperdal "gives him liver problems." *Id.* In September, however, Page noted that Brown reported wanting medication and that he was sporadically "hearing voices" that "put him down" and "tell him that he's no good." *Id.* at 518. Page moved up Brown's appointment with a medical doctor in October after Brown reported that he was depressed and was "having a hard time managing his thoughts." *Id.* at 516. Page noted that Brown also indicated that he wanted medication "to calm him down" because he felt "anxious" and had difficulty sleeping. *Id.*

Mcheko Graves-Matthews, M.D., saw Brown in October and November 2012. In October, Dr. Graves-Matthews noted that Brown was more willing to consider to take psychiatric medication because he was "becoming more symptomatic" than when Page saw him in August 2012 in that he was experiencing paranoia, auditory hallucinations, and insomnia. *Id.* at 514. Dr. Graves-Matthews further noted that Brown "present[ed] as quite disorganized" and that Brown "ramble[d] about various 'odd' experiences he [was] having such as thought broadcasting (hearing others['] thoughts about him) and ideas of reference." *Id.* Dr. Graves-Matthews prescribed Risperdal and lithium. *Id.* He diagnosed Brown with "Psychotic Disorder, nos R/O Schizophrenia/Bipolar Disorder with psychotic feas/Substance Induced Psychosis." *Id.* In subsequent visits later in October and in November 2012, Dr. Graves-Matthew noted that Brown's symptoms had improved and that he was "much more relaxed" even though he still experienced some paranoia. *Id.* at 510, 512.

g. Fred Finch Youth Center: November 2013

In a report from November 2013, a clinician at Fred Finch Youth Center changed Brown's alcohol abuse diagnosis to being in "Full Remission" because Brown "ha[d] been clean and sober for the past year." *Id.* at 389. The clinician also noted that Brown started "the process of enrolling in community college while completing test sections to receive his" general equivalency diploma and that Brown "increased contact" with the STAY Program so as to work on improving his activities of daily living and social skills. *Id.* at 392. Moreover, the clinician indicated that Brown was working "both independently and with the support of an employment specialist." *Id.* The clinician further noted, however, that Brown was still disorganized and had trouble keeping track

of papers and appointments. *Id.* at 394.

### h. Ede Thomsen, Ph.D.

Ede Thomsen, Ph.D., examined Brown on February 14, 2014. *Id.* at 409–22. In addition to conducting a clinical interview, Dr. Thomsen also administered the following tests: (1) Repeatable Battery for the Assessment of Neuropsychological Status, Form A ("RBANS-A"); (2) Weschler Abbreviated Scale of Intelligence ("WASI"); (3) Trail Making A and B; (4) Clock Drawing Task; (5) Annotated Mini Mental State Examination ("AMMSE"); (6) Beck Depression Inventory ("BDI"); (7) Beck Anxiety Inventory ("BAI"); and (8) Millon Clinical Multiaxial Inventory-III ("MCMI-III"). *Id.* at 412.

Dr. Thomsen first addressed Brown's cognitive functioning. According to Dr. Thomsen, Brown's overall IQ was 100, placing Brown in the fiftieth percentile. *Id.* Dr. Thomsen also found that Brown "ha[d] a severe deficit" with respect to his ability to maintain attention and concentration; Brown's score on the RBANS-A "place[d] him in the extremely low range of functioning at the 2nd percentile." *Id.* at 413. Dr. Thomsen also found that Brown had a mild impairment in terms of his executive functioning. *Id.* With respect to Brown's memory, Dr. Thomsen determined that Brown tested "within normal limits in this domain." *Id.* Dr. Thomsen also found that Brown had a mild limitation concerning his language functioning, as he scored "in the average range at the 23rd percentile" of the language index of the RBANS. *Id.* at 414.

Dr. Thomsen then turned to Brown's emotional functioning. Dr. Thomsen found that Brown experienced "minimal depression" and "mild anxiety" according to the BDI and BAI, respectively. *Id.* at 414. Dr. Thomsen determined that Brown's test results on the MCMI-III showed that Brown was not malingering. *Id.* at 415. Dr. Thomsen further determined that "[t]he results of Mr. Bown's MCMI-III indicate that on the basis of the test data, it may be assumed that he is experiencing a severe mental disorder." *Id.* Dr. Thomsen further found that, "[a]ccording to the MCMI-III, Mr. Brown has Major Depression, Generalized Anxiety Disorder, and Psychoactive Substance Abuse NOS." *Id.* at 418. In addition, Dr. Thomsen determined that Brown "may also have Dependent Personality Traits, Antisocial Personality Traits, Depressive Personality Traits, Depressive Personality Features, and Avoidant Personality Features." *Id.*

On Axis I, Dr. Thomsen diagnosed Brown with "Major Depressive Disorder, Recurrent, Mild," "Anxiety Disorder NOS," and "Polysubstance Dependence in Sustained Full Remission." *Id.* at 419. On Axis II, Dr. Thomsen diagnosed Brown with "Dependent Personality Traits, Antisocial Personality Traits, Depressive Personality Features, and Avoidant Personality Features." *Id.* Dr. Thomsen deferred diagnosis on Axis III. *Id.* On Axis IV, Dr. Thomsen noted that Brown had "[f]ew social supports," "financial problems," and "difficulty attaining physical and mental health care." *Id.* Dr. Thomsen also noted that Brown was unemployed. *Id.* On Axis V, Dr. Thomsen found that Brown had a GAF of 45. *Id.*

In conclusion, Dr. Thomsen found that Brown had mild limitations with respect to Brown's ability to "[g]et along and work with others" as well as Brown's ability to "[r]espond appropriately to changes in a routine work setting and deal with normal work stressors." *Id.* at 422. Dr. Thomsen determined that Brown had moderate restrictions in terms of his ability to: (1) "[u]nderstand, remember, and carry out detailed instructions"; (2) "perform at a consistent pace without an unreasonable number and length of rest periods"; and (3) "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms." *Id.* Lastly, Dr. Thomsen found that Brown had marked restrictions concerning his ability to "[m]aintain attention and concentration for two hour segments" as well as his ability to "[m]aintain regular attendance and be punctual within customary, usually strict tolerances." *Id.*

### i. Kevin Gregg, M.D.

Kevin Gregg, M.D., a state agency consultant, reviewed Brown's medical records in February 2014 and found that he suffered from the following medically determinable impairments: affective disorders (primary, severe); anxiety disorders (secondary, severe); and substance addiction disorders (other, severe). AR 62. Dr. Gregg considered Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders) and found none of Brown's medically determinable impairments satisfied the 'paragraph A' criteria for any of those Listings. *Id.* Dr. Gregg also evaluated whether any of Brown's impairments satisfied the 'paragraph B' criteria for the same Listings and determined that they did not. *Id.* at 62–63. Dr. Gregg found that Brown had a mild restriction of activities of daily living, a mild difficulty in

maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and "One or Two" episodes of decompensation of extended duration. *Id.* He also concluded that Brown's impairments did not meet the 'paragraph C' criteria for Listings 12.04, 12.06, and 12.09. *Id.* at 63. He attributed "great weight" to Dr. Thomsen's opinion. *Id.* at 64.

Dr. Gregg then completed an RFC and found that Brown had moderate limitations concerning his ability to "understand and remember detailed instructions," his ability to "carry out detailed instructions," his ability to "maintain attention and concentration for extended periods," his ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* at 64–65. Accordingly, Dr. Gregg concluded that Brown "is able to meet the basic mental and emotional demands of competitive, remunerative unskilled work." *Id.* at 65.

### j. Anna Franco, Psy.D.

Anna Franco, Psy.D, a state agency consultant, completed a reconsideration analysis in May 2014. *Id.* at 69–81. She reviewed Brown's medical history and found that he suffered from: affective disorders (primary, severe); anxiety disorders (secondary, severe) and substance addiction disorders (other, severe). *Id.* at 75. She considered the same listings that Dr. Gregg considered, namely Listings 12.04, 12.06, and 12.09, and she reached the same conclusion that Brown's impairments do not satisfy the 'paragraph A,' 'paragraph B,' or 'paragraph C' criteria for any of those listings. *Id.* at 75–76. Like Dr. Gregg, she attributed "great weight" to Dr. Thomsen's opinion and found that he suffered from the same moderate limitations as discussed above. *Id.* at 76–79. Dr. Franco found that Brown's impairments limited him to unskilled work and that he was not disabled. *Id.* at 80.

### k. Alameda County Behavioral Health Care Services: September 2014–April 2016

Brown visited Alameda County Behavioral Health Care Services several times between September 2014 and April 2016. *See id.* at 548–69. In September 2014, Kate Wadsworth,

LSCW, diagnosed Brown with "DEPRESSIVE DISORDER NOS" on Axis I.  *Id.* at 564.  On Axis II, she deferred diagnoses.  *Id.*  On Axis III, Wadsworth found that Brown had "No General Medical Condition."  *Id.*  On Axis IV, she listed numerous legal and socioeconomic problems, including that Brown was at risk of losing his apartment and that Brown did not have "familial support" or a "source of income."  *Id.*  She further noted that Brown was looking for a job, "but [his] past criminal background [was] making it very difficult for him to obtain employment."  *Id.* On Axis V, Wadsworth noted that Brown had a GAF of 56.  *Id.*  At a subsequent visit, Wadsworth found that Brown had a GAF of 60.  *Id.* at 558.  She noted that Brown had been sober for two years and had been attending Alcoholics Anonymous meetings daily.  *Id.*  At other subsequent visits, Brown reported that he was proud for getting a job, going to the gym, attending Alcoholics Anonymous meetings, going to church, and having increased focus.  *Id.* at 554, 560.

In April 2016, Janetta Gerlingson, M.D., noted that Brown expressed a desire to increase his medication because he wanted to decrease in his psychiatric symptoms.  *Id.* at 548.  Brown reported experiencing anxiety attacks and auditory hallucinations.  *Id.*  Dr. Geringson noted that Brown had been "more depressed and more anxious" recently, and he had been started on medications.  *Id.* at 550.  She found that Brown had a GAF of 40.  *Id.*

### 3. Administrative Hearing on May 25, 2016

The ALJ began his examination of Brown with questions concerning Brown's employment history.  *Id.* at 41–42.  He asked Brown whether he was currently employed, and Brown testified that he was not.  *Id.* at 42.  The ALJ then remarked that the Social Security earnings record indicate that Brown worked for Target in 2013 and 2014.  *Id.*  Redditt explained that she did not believe that the earnings record was correct, and the ALJ remarked that the earnings record was unverified and listed a different name than Brown's.  *Id.* at 42–43.  The ALJ then asked Brown whether he was currently taking any medications, and Brown testified that he was taking medications for depression and anxiety.  *Id.* at 43.  He further testified that he was seeing a pyschiatrist, who prescribed his medications.  *Id.*

The ALJ also asked Brown about his daily activities.  *Id.* at 43.  Brown testified that "on normal days," he would "wake up" and "focus on sitting in the house, getting ready."  *Id.* at 44.

12

He further testified that he usually attends Alcoholics Anonymous meetings and that he would either go to work or "try to find an activity to do" if he was not working. *Id.* The ALJ asked Brown whether he had worked recently, and Brown testified that he worked as a dishwasher at Home Town Buffett for a few months in 2015. *Id.* He further testified that he did janitorial work at a Mexican restaurant for several months after he worked at Home Town Buffet. *Id.* at 44–45. The ALJ asked Brown whether he experienced any difficulty while performing those jobs, and Brown testified that he had trouble focusing. *Id.* at 45. Brown explained that "[t]here were these days when [the workdays] would be too fast for [him] to actually concentrate and multitask." *Id.* Brown also testified that he "would ask for less hours" when it became difficult for him to complete his job duties. *Id.* The ALJ asked Brown whether he has had problems focusing for a long time, and Brown answered in the affirmative. *Id.* at 46.

Redditt then began her examination of Brown by asking Brown what sort of mental health conditions he was currently experiencing. *Id.* Brown testified that he was currently suffering from depression and anxiety and that he had trouble focusing and concentrating. *Id.* He further testified that he experiences auditory hallucinations in the form of the voices of "other people, or dead family members that [have] pass[ed] away" that tell him he "was no good," he "wasn't worth it," he "shouldn't be alive," and that he will not "achieve" anything. *Id.* Redditt asked Brown about the symptoms he experiences when he becomes anxious, and Brown testified that he feels "very tingled," his "heart starts beating faster," he "start[s] breathing heavily," and it becomes difficult for him to concentrate. *Id.* at 47. Redditt further questioned Brown regarding his anxiety, asking whether he experiences anxiety at night. *Id.* Brown answered in the affirmative. *Id.* Redditt asked Brown whether his anxiety affects his ability to sleep, and Brown testified that he has difficulty falling asleep and staying asleep. *Id.* He also testified that he sleeps approximately five or six hours per night. *Id.* Redditt then asked Brown about his current medications. *Id.* at 48. Brown testified that he took Prozac and Naproxen. *Id.* Redditt asked Brown whether he experienced any side effects from his medications, and Brown testified that the thought the Naproxen made him feel drowsy. *Id.*

VE Beeman and the ALJ then discussed Brown's work history before the ALJ asked

Brown whether his most recent jobs at Home Town Buffet and a Mexican restaurant were part-time. *Id.* at 48–49. Brown testified that both of those jobs were part-time. *Id.* at 50. The ALJ also asked Brown about his attendance at Alcoholics Anonymous meetings and whether he had been clean and sober. *Id.* Brown testified that he had been clean and sober, but he relapsed once in October of 2014. *Id.*

Redditt then began her examination of VE Beeman by asking VE Beeman if, "[a]ssuming an individual with [Brown's] age, education, and work history," there would be "any jobs if [Brown] had moderate to marked limitation in the ability to perform activities within a schedule and maintain regular attendance." *Id.* at 50–51. VE Beeman testified that such an individual "would not be employable." *Id.* at 51. Redditt then asked whether there would be any jobs that an individual of Brown's age, education, and work history could perform if that individual had "more than a 20 percent reduction in the ability to function" in terms of "maintain[ing] concentration, persistence, and pace." *Id.* VE Beeman testified that such an individual would not be employable. *Id.* Redditt then asked VE Beeman whether it would make a difference if she were to switch the hypothetical to a "not more than 20 percent reduction in function . . . to complete a normal work day and work week without interruptions from psychologically based symptoms." *Id.* VE Beeman testified that it would not make a difference, explaining that if such an individual "is off task—is literally not doing the work, you know, even 45 minutes a day, . . . employers are not going to keep that individual." *Id.* at 51–52. Accordingly, VE Beeman concluded that all of the hypothetical individuals Redditt proposed were unemployable. *Id.* at 52.

### C. Legal Background for Determination of Disability

#### 1. Five-Step Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 432(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age,

14

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a "five-step sequential evaluation process" to determine if a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  "The claimant bears the burden of proving steps one through four, consistent with the general rule that '[a]t all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits.'"  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)).  At Step One, the ALJ must determine if the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  If so, the ALJ determines that the claimant is not disabled and the evaluation process stops.  If the claimant is not engaged in substantial gainful activity, then the ALJ proceeds to Step Two.

At Step Two, the ALJ must determine if the claimant has a "severe" medically determinable impairment.  An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled.  If the claimant does have a severe impairment, the ALJ proceeds to Step Three.

At Step Three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "listing").  *See* Appendix 1, Subpart 1 of 20 C.F.R. Part 404.  If the claimant's impairment is included in the listing, then the claimant is disabled.  The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment.  If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to Step Four.

At Step Four, the ALJ must assess the claimant's Residual Function Capacity ("RFC").  An RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4).  Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough

United States District Court
Northern District of California

for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform his past relevant work, then the ALJ finds that he is not disabled. If the claimant is unable to perform his past relevant work, then the ALJ proceeds to Step Five.

At Step Five, the burden shifts from the claimant to the Commissioner. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1223 (9th Cir. 2009). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite his identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner is able to identify such work, then the claimant is not disabled. If the Commissioner is unable to do so, then the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

### 2. Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a;[6] *see also Clayton v. Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)). First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(b)(2), (c). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or

---

[6] The parties' briefs do not address amendments to the regulations and listings pertaining to mental impairments that became effective after the ALJ's decision but before Brown filed the present action. With no party arguing that the new versions of those regulations and listings should apply here, the Court assumes for the purpose of this order that the versions of the mental impairment regulations and listings in effect at the time of the ALJ's decision continue to apply. Citations to all such regulations and listings therefore refer to those versions.

equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R.

§ 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability

inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

presence of various listed mental impairments, but all listed mental impairments share certain

"Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically

determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more

listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the

general Paragraph B criteria, which require that the claimant suffers at least two of the following:

(1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social

functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or

(4) repeated episodes of decompensation, each of extended duration. *See id.* A "marked"

limitation is one that is "more than moderate but less than extreme" and "may arise when several

activities or functions are impaired, or even when only one is impaired, as long as the degree of

limitation is such as to interfere seriously with [a claimant's] ability to function independently,

appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

This evaluation process is to be used at the second and third steps of the sequential

evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The

adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C'

criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at

steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the

claimant has one or more severe mental impairments that neither meet nor are equal to any listing,

the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§

404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the

sequential process [and] requires a more detailed assessment by itemizing various functions

contained in the broad categories found in paragraphs B and C of the adult mental disorders

listings in 12.00 of the Listing of Impairments . . . . " Social Security Ruling 96-8p, 1996 WL

374184, at *4.

### D. The ALJ's Decision

#### 1. Step One: Substantial Gainful Activity

At Step One, the ALJ found "for the purpose of [his] decision" that Brown "has not engaged in substantial gainful activity since October 31, 2013, the application date." AR at 24. Records showed significant wages paid to someone using Brown's Social Security number, but not using Brown's name, and Brown denied working for the employers at issue. *See id.* The ALJ credited that denial but instructed the Social Security Administration to "develop the issue of those earnings and take any corrective action as might be necessary." *Id.*

#### 2. Step Two: Severe Impairments

At Step Two, the ALJ determined that Brown "has the following severe impairments: affective disorders; substance use disorder." *Id.* at 25. He found that "[t]he evidence of record establishes that the above impairments significantly limit [Brown's] ability to perform basic work activities . . . and therefore are considered 'severe.'" *Id.*

#### 3. Step Three: Medical Severity

At Step Three, the ALJ found that Brown "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." *Id.* In making this determination, the ALJ "considered whether the 'paragraph B' criteria [were] satisfied" for listings "12.04, 12.09 or any other section." *Id.* The ALJ noted that, in order to satisfy the "paragraph B" criteria, Brown's "mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." *Id.*

The ALJ found that Brown has a "mild to moderate restriction" in activities of daily living. *Id.* He noted that Dr. Thomsen found Brown had a moderate restriction and that Drs. Franco and Gregg concluded that Brown had a mild restriction concerning his activities of daily living. *Id.* The ALJ then concluded that Brown has "mild to moderate difficulties" in terms of social functioning, noting that Dr. Thomsen and state agency psychological consultants "opined that

18

[Brown] has mild difficulties in maintaining social functioning." *Id.* at 26. He also determined that Brown has "moderate difficulties" concerning "concentration, persistence, or pace." *Id.* The ALJ acknowledged that Dr. Thomsen "opined that [Brown] has severe difficulties with attention/concentration," but he concluded that "the record as a whole does not establish such limitations for any twelve-month period or otherwise on a consistent basis." *Id.* The ALJ concluded that Brown "has experienced no episodes of decompensation of extended duration." *Id.* The ALJ pointed out that Brown "was admitted to John George Psychiatric Pavilion" in April 2012 "on an involuntary psychiatric ['5150'] hold." *Id.* He also noted, however, that Brown was "discharged on the same day" and that Brown was "calm, sober, and goal-directed, and he denied current mood problems, auditory hallucinations, or paranoid ideation" while at John George Psychiatric Pavilion. *Id.* Accordingly, the ALJ concluded that the "paragraph B" criteria were not satisfied. *Id.*

The ALJ then considered whether the "paragraph C" criteria were satisfied and concluded that "the evidence in this case fails to establish the presence of 'paragraph C criteria.'" *Id.* at 27. The ALJ determined that the "paragraph C" criteria for Listing 12.04 were not satisfied "because the records do not indicate repeated episodes of decompensation; a residual disease process that has resulted in such marginal adjustment that a minimal increase in mental demands or environment would be predicted to cause decompensation; or an inability to function outside a highly supportive living arrangement." *Id.*

#### 4. Step Four: Residual Functional Capacity

At Step Four, the ALJ determined that Brown "has the residual functional capacity to perform a full range of work at all exertional levels" and that Brown "can perform simple, routine tasks equating to unskilled work." *Id.* at 27. In support of this determination, the ALJ noted that he "ha[d] considered all symptoms and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence." *Id.* He further noted that he "ha[d] also considered opinion evidence." *Id.*

The ALJ gave "substantial weight to the assessment" performed by state agency psychological consultants Kevin Gregg, M.D., and Anna Franco, Psy.D. *Id.* at 30. The ALJ

reasoned that the "State agency assessed a capacity for simple repetitive tasks" and that the agency's "assessment is generally supported by the weight of the evidence of record." *Id.* He further reasoned that "[d]espite periods of exacerbation of symptoms, [Brown's] conditions generally have responded to treatment, and the record does not establish an inability for at least simple routine tasks equating to unskilled work for any twelve-month period." *Id.*

The ALJ also "g[ave] weight" to Dr. Thompsen's opinion "to the extent that she assessed that [Brown] has no significant limitation in the ability to understand, remember, and carry out simple instructions and as otherwise consistent with the capacity for unskilled work." *Id.* The ALJ rejected Dr. Thompsen's opinion "to the extent that greater limitations are indicated," reasoning that any greater limitations "are found to be contradicted by the weight of the evidence with respect to the residual functional capacity for simple routine tasks equating to unskilled work." *Id.* The ALJ further reasoned that "Dr. Thompsen's opinion was based on a one-time evaluation and appears to be based in large degree upon [Brown's] subjective complaints which have not been found consistent with the record." *Id.*

The ALJ attributed "little weight" to Dr. El-Sokkary's opinion, noting that the opinion was generated "in connection with a prior application" for supplemental security income under Title XVI of the Social Security Act. *Id.* In support of his determination that Dr. El-Sokkary's opinion should be afforded little weight, the ALJ reasoned that Dr. El-Sokkary "assessed an ability for simple repetitive tasks but limitations that have not been established for the requisite period, even without considering substantial admitted drug and alcohol use during that prior period." *Id.*

Concerning Brown's credibility, the ALJ found that while Brown's "medically determinable impairments could reasonably be expected to cause the type of alleged symptoms," his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not found to be consistent with the medical evidence and other evidence in the record to the extent [they are] inconsistent with the residual functional capacity finding for the reasons explained in this decision." *Id.* at 28. The ALJ also found that the record did not support Brown's "testimony and subjective allegations." *Id.* at 30. In support of this conclusion, the ALJ noted that Brown's activities of daily living supported the residual functional capacity that the ALJ assessed. *Id.* He

pointed out that during Brown's alleged period of disability, Brown sought employment, worked part-time jobs, attended Alcoholics Anonymous meetings, went to church, abstained from drinking alcohol, went to the "gym every day with the help of his friend," and "was able to focus and concentrate more than he ever had before." *Id.* at 30–31.

### 5. Step Five: Ability to Perform Other Jobs in the National Economy

The ALJ found that, "[c]onsidering [Brown's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Brown] can perform." *Id.* at 31. The ALJ supported this finding by noting that Brown's "ability to perform work at all exertional levels has been compromised by nonexertional limitations. However, these limitations have no effect on the occupational base of unskilled work at all exertional levels." *Id.* Accordingly, the ALJ determined that "[a] finding of 'not disabled is therefore appropriate under the framework of Section 204.00 in the Medical -Vocational Guidelines." *Id.* The ALJ concluded that Brown "is not disabled and is not eligible for supplemental security income under Section 1614(a)(3)(A) of the Social Security Act." *Id.* at 32.

### E. Motions for Summary Judgment

#### 1. Brown's Motion for Summary Judgment

Brown filed this action seeking review of the ALJ's decision and now moves for summary judgment on the basis that the ALJ committed five errors in his September 2016 decision. First, Brown alleges that the ALJ erred at Step Two because "he failed to include Borderline Intellectual Functioning/Cognitive Disorder among his severe impairments." Brown's Mot. at 12. Second, Brown argues that the ALJ improperly evaluated the medical opinion evidence when he "rejected, sometimes without discussion, the opinions of [Brown's] examining psychiatrists and psychologists Drs. Geringson, El-Sokkar[y], and Thomsen; treating psychiatrists Drs. Aitchinson, Roxas, and Matthews-Graves; treating therapists, Mr. Page, Mr. Maller, and Ms. Wadsworth . . . without providing specific and legitimate or germane reasons supported by substantial evidence." *Id.* at 13–14. Third, Brown contends that the ALJ erred in rejecting Brown's testimony because he failed to provide clear and convincing reasons for doing so. Brown's Mot. at 17–23. Fourth, Brown argues that the ALJ erred when he relied on an RFC that was not supported by substantial

evidence.  *Id.* at 23–24.  Finally, Brown contends that the ALJ erred by improperly relying on the Medical-Vocational Guidelines instead of a vocational expert due to Brown's nonexertional limitations.  *Id.* at 24–25.  Brown reiterates these arguments in his reply brief.  *See generally* Reply (dkt. 28).

Brown asks the Court to remand for further administrative proceedings; he does not seek an order from this Court awarding benefits.  *See id.* at 13; Brown's Mot. at 25.

### 2. The Commissioner's Motion for Summary Judgment

The Commissioner filed a cross-motion for summary judgment, asking the Court to affirm the ALJ's decision that Brown is not disabled.  Comm'r's Mot. at 1.  The Commissioner argues that "because the ALJ correctly evaluated the opinion evidence, [Brown's] subjective testimony and the step two finding, the ALJ's RFC and the step five findings were also proper."  *Id.* at 2 n.3.

Concerning the medical opinion evidence, the Commissioner contends that the ALJ properly rejected part of Dr. Thomsen's opinion because "Dr. Thomsen's opinion regarding [Brown's] marked mental limitations contradicted the rest of the record evidence," including the doctor's own findings.  *Id.* at 4.  The Commissioner further contends that the ALJ properly rejected Dr. El-Sokkary's opinion in part because Dr. El-Sokkary examined Brown before the alleged onset date and because "the record evidence supports the ALJ's decision to discount the doctor's opinion that [Brown] lacks the mental functioning capacity to even perform simple unskilled work."  *Id.* at 8.  The Commissioner also argues that Brown "failed to articulate with any specificity what" other medical practitioners "exactly opined regarding [Brown's] mental functional capacity, and how those opinions are relevant to his claim that he cannot perform simple, routine and unskilled work for the relevant period in this case."  *Id.* at 9 (citing *Champagne v. Colvin*, 582 F. App'x 696, 697 (9th Cir. 2014)).

The Commissioner next argues that the ALJ properly listed all of Brown's severe mental impairments at Step Two, emphasizing that "the mere diagnosis of a mental impairment does not mean that it is severe under the regulations."  *Id.* at 10 (citing *Sample v. Schweiker*, 694 F.2d 639, 642–43 (9th Cir. 1982)).  Additionally, the Commissioner asserts than because the ALJ properly considered all of Brown's "mental allegations and mental health evidence throughout the

remaining sequential evaluation," any error at Step Two was harmless. *Id.* at 11 (citing *Garcia v. Comm'r of Soc. Sec.*, 587 F. App'x 367, 370 (9th Cir. 2014)).

Finally, the Commissioner contends that the ALJ properly rejected Brown's subjective testimony because Brown's "allegations of debilitating symptoms were not supported by the medical evidence of record" and because Brown's employment history and activities of daily living showed that Brown had a greater residual functional capacity than he alleged. *Id.* at 12–16.

## III. ANALYSIS

### A. Legal Standard Under 42 U.S.C. §§ 405(g) and 1383(c)(3)

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

**B.    Any Error in Determining Brown's Severe Impairments Was Harmless**

The purpose of the Step Two inquiry, requiring that the claimant demonstrate that she has an impairment or combination of impairments that is severe, is to screen out groundless claims. *Smolen*, 80 F.3d at 1290. "An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Id.* (citations omitted).  Once a claimant prevails at Step Two, "regardless of which condition is found to be severe, the Commissioner proceeds with the sequential evaluation, considering at each step *all* other alleged impairments and symptoms that may impact her ability to work." *Angeli v. Astrue*, No. CIV S-06-2592 (EFB), 2008 WL 802334, at *3 (E.D. Cal. Mar. 25, 2008) (citing 42 U.S.C. § 423(d)(2)(B) (emphasis added)).  Thus, failure to find that an impairment is severe at Step Two does not necessarily constitute reversible error. *Id.*  "Rather, the question is whether the ALJ properly considered the functional limitations of all medically determinable impairments at the remaining steps." *Id.* (citing *Smolen*, 80 F.3d at 1290) (holding that if one severe impairment exists, the ALJ must consider all medically determinable impairments in the subsequent steps of the sequential analysis) (citing 20 C.F.R. § 404.1523)); *see also Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (holding that where the ALJ was alleged to have erred at Step Two by failing to find that one of claimant's alleged impairments was severe, it could only have prejudiced the claimant "in step three (listing impairment determination) or step five (RFC)"); *Nicholson v. Colvin*, 106 F. Supp. 3d 1190, 1195 (D. Or. 2015) ("[O]missions at step two are often harmless error if step two is decided in plaintiff's favor.").

The Ninth Circuit applies a harmless error analysis to social security appeals.  *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011); *Molina*, 674 F.3d at 1115 ("We have long recognized that harmless error principles apply in the Social Security Act context." (citation omitted)); *see also Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) ("[W]e apply harmless error analysis to social security cases.").  The application of the harmless error analysis is "fact-intensive," as "no presumptions operate," and courts "must analyze harmlessness in light of the circumstances of the case." *Marsh*, 792 F.3d at 1172 (quoting *Molina*, 674 F.3d at 1121).  "ALJ errors in social security cases are harmless if they are 'inconsequential to the ultimate nondisability determination'

and . . . 'a reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.* at 1173 (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). In *McLeod v. Astrue*, the Ninth Circuit held that "remand is appropriate" when "the circumstances of the case show a substantial likelihood of prejudice." 640 F.3d at 888. Alternatively, the court explained that "where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." *Id.* (internal quotation marks omitted). Furthermore, the court also found that, "despite the burden to show prejudice being on the party claiming error by the administrative agency, the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 410–11 (2009)). Lastly, courts "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (citing *SEC v. Chenery Corp*, 332 U.S. 194, 196 (1947)).

Brown contends that the ALJ erred because he "failed to include Borderline Intellectual Functioning/Cognitive Disorder among his severe impairments." Brown's Mot. at 12. As an initial matter, it is worth noting that none of the physicians Brown cited in support of this contention explicitly diagnosed Brown with cognitive disorder. Drs. Thomsen and Roxas did not include cognitive disorder in their diagnoses, Dr. El-Sokkary diagnosed Brown with "R/O Cognitive Disorder, nos," and "Borderline Intellectual Functioning," and Ms. Worgull diagnosed Brown with "Psychotic Disorder NOS versus R/O Cognitive Dis[order] NOS." *See* AR 276, 435. "A 'rule-out' diagnosis is by no means a diagnosis. In the medical context, a 'rule-out diagnosis means there is evidence that the criteria for a diagnosis *may* be met, but more information is needed in order to rule it out." *Carrasco v. Astrue*, No. ED CV 10-0043 (JCG), 2011 WL 499346, at *4 (C.D. Cal. Feb. 8, 2011) (emphasis in original, citations omitted); *see also Garner v. Comm'r of Soc. Sec.*, No. 2:17-CV-00232 (LRS), 2018 WL 2224061, at *3 (E.D. Wash. May 15, 2018) ("A 'R/O' (Rule Out) diagnosis means there is uncertainty about the diagnosis and although there is evidence that the criteria for the diagnosis may be met, more information is needed to rule it

out.").

To the extent that the ALJ committed any error at Step Two, such error was harmless because the ALJ went on to address the concerns raised by Brown at subsequent points within the five-step framework. *See Lewis*, 498 F.3d at 911 (holding that the ALJ's failure to list plaintiff's bursitis at Step Two constituted a harmless error because the ALJ's decision "reflect[ed] that the ALJ considered any limitations posed by the [plaintiff's] bursitis at Step 4"); *see also Williams v. Colvin*, 24 F. Supp. 3d 901, 917–18 (N.D. Cal. 2014) (citing *Lewis*, 498 F.3d at 911) (holding that any error at Step Two concerning the ALJ's failure to list plaintiff's "anxiety/panic disorder" was harmless because the ALJ "considered that limitation later in the sequential evaluation process").

Here, Brown contends that the ALJ failed to consider findings from practitioners that Brown exhibited symptoms of cognitive disorder and borderline intellectual functioning. Brown's Mot. at 12. Brown argues that health care practitioners, including Dr. Thomsen, Ms. Worgull, Dr. Roxas, and Mr. Maller, "observed that [Brown's] intellectual and cognitive limitations significantly limit his abilities to engage in social interaction and maintain concentration, persistence, and pace and therefore have more than a minimal effect on his ability to perform basic work activities." *Id.* The ALJ, however, addressed such concerns at later steps within the five-step framework, curing any error. *Lewis*, 498 F.3d at 911. For example, at Step Three, the ALJ found that Brown had a moderate limitation with respect to his ability to maintain concentration, persistence, or pace after considering Brown's testimony that he "ha[d] problems with concentration," Dr. El-Sokkary's finding that Brown could "repeat 6 digits forward and 3 digits backwards), and Dr. Thomsen's finding that Brown "was able to repeat a string of 5 digits forward and subtract a string of sevens from 100." AR 26. He also discussed Dr. Thomsen's conclusion that Brown had "severe difficulties with attention/concentration." *Id.* At Step Four, the ALJ again discussed Brown's testimony that he had difficulty concentrating, noting that his part-time job resulted in "days that were too fast-paced for him to concentrate and multi-task." *Id.* at 28. He also noted that Brown's concentration was impaired in April 2016 when Dr. Geringson conducted a mental status evaluation at Alameda County Behavioral Health Care Services. *Id.* at 29. Accordingly, any error at Step Two is harmless because it does not appear that Brown was

26

diagnosed with a cognitive disorder, and the ALJ addressed many of the symptoms Brown associates with cognitive disorder and borderline intellectual functioning at subsequent steps within the five-step framework.

## C. The ALJ Improperly Weighed the Medical Opinion Evidence

### 1. Legal Standard for the Evaluation of Medical Opinions

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "[T]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Id* at 1202 (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012–13. Thus, failure to mention a treating physician's opinion without providing specific and legitimate reasons supported by substantial evidence constitutes an error. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1172–73 (9th Cir. 2015) ("Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them.").[7]

### 2. Legal Standard for Evidence that Predates the Onset Date of Disability

"Medical opinions that predate the alleged onset disability are of limited relevance." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (citing *Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir. 1989)). The Ninth Circuit, however, has held that the ALJ is required to consider "all medical opinion evidence." *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)). In an unpublished opinion, the Ninth Circuit applied this rule to include evidence that predates the alleged onset date of disability. *See Williams v. Astrue*, 493 F. App'x 866, 868 (9th Cir. 2012). In another unpublished opinion, the Ninth Circuit held that the ALJ may reject medical evidence that predates the alleged onset disability date "in favor of more recent opinions" when the more recent medical opinion recent evidence is "consistent with the record as a whole." *Brown v. Comm'r of Soc. Sec.*, 532 F. App'x 688, 689 (9th Cir. 2013) (citation and internal quotation marks omitted). The Court is unaware of published Ninth Circuit authority addressing the issue and finds the reasoning of the memorandum dispositions in *Williams* and *Brown* persuasive.

---

[7] The regulations governing treatment of medical evidence have been amended with respect to applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c. Because Brown filed his application before that date, the older framework applies here.

### 3. Legal Standard for the Evaluation of Other Sources

Social workers and therapists are not considered "acceptable medical sources" under the regulations that were in effect at the time of the ALJ's decision.[8] *See* 20 C.F.R. § 416.913 (effective Sept. 3, 2013 to Mar. 27, 2017) (providing that "other sources" can "show the severity" of a claimant's impairments, even if they are not "acceptable medical sources" who are qualified to "provide evidence to establish an impairment"); *Mack v. Astrue*, 918 F. Supp. 2d 975, 983 (N.D. Cal. Jan. 15, 2013) ("A social worker, even a licensed clinical social worker, is not an acceptable medical source under the regulations and therefore cannot be given great or controlling weight."). The Ninth Circuit has held, however, that "[i]n addition to considering the medical opinions of doctors, an ALJ must consider the opinions of medical providers who are not within the definition of 'acceptable medical sources.'" *Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (citations omitted). "While those providers' opinions are not entitled to the same deference, an ALJ may give less deference to 'other sources' only if the ALJ gives germane reasons to each witness for doing so." *Id.* (citing *Molina*, 674 F.3d at 1111).

The Ninth Circuit has also held that "other sources" can qualify as "acceptable medical sources" when they work in close connection with or as an agent of an "acceptable medical source." *See Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996) *superseded by regulation as stated in Boyd v. Colvin*, 524 F. App'x 334, 336 (9th Cir. 2013) (holding that the findings of a nurse practitioner that "was acting as an agent" of a licensed physician "was properly considered" as part of that licensed physician's opinion"); *see also Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1234 (9th Cir. 2011) ("To the extent [the nurse practitioner] was working closely with, and under the supervision of [the physician], her opinion is to be considered that of an acceptable medical source."); *Molina*, 674 F.3d at 1111 (finding that a physician's assistant "did not qualify as a medically acceptable treating source because . . . the record [did] not show that she worked under a physician's close supervision").

---

[8] The Commissioner argues that those regulations should apply to this review of the ALJ's decision, and Brown does not address the issue. The Court assumes for the purpose of this order that the regulations in effect at the time of the ALJ's decision apply.

United States District Court
Northern District of California

### 4. Janetta Geringson, M.D.

Brown briefly contends that the ALJ improperly rejected the opinion of Dr. Geringson, although he does not focus on Dr. Geringson or identify any specific opinions of Dr. Geringson that he ALJ should have credited. *See* Brown's Mot. at 13. Instead, Brown notes only that Dr. Geringson's finding of "impaired concentration and hesitant speech" supports Dr. El-Sokkary's opinions and Brown's own testimony. *Id.* at 15; *see* Reply at 11. Though the ALJ did not mention Dr. Geringson by name, the ALJ did discuss Dr. Geringson's findings in some detail. The ALJ noted:

> In April 2016, mental status examination [i.e., the examination conducted by Dr. Geringson] showed that [Brown] was cooperative, psychomotor activity was within normal limits, speech was hesitant, mood was anxious, and affect was decreased in intensity and sad. His orientation was within normal limits and he was alert. His memory was within normal limits, but his concentration was impaired. He endorsed auditory hallucinations, but no visual hallucinations. His thought process was logical and thought content was within normal limits. He was accepting of his problem and wanted help. He complained of insomnia and appetite disturbance. GAF was rated at 40 at that point, and [Dr. Geringson] noted that [Brown] had been more depressed and more anxious. [Dr. Geringson] also noted that [Brown] had been started on medications about one month prior. He requested that his dosages of medications be increased to decrease his symptoms.

AR 29. At no point did the ALJ explicitly reject Dr. Geringson's opinions. At least with respect to Brown's "impaired concentration"—the finding by Dr. Geringson primarily addressed in Brown's briefs—the ALJ appears to have credited that opinion, finding that Brown experienced "moderate difficulties in maintaining concentration, persistence or pace." *Id.* at 26. Accordingly, the Court finds no reason to reverse the Commissioner's determination based on the ALJ's treatment of Dr. Geringson's medical opinion evidence.

### 5. Ede Thomsen, Ph.D.

Brown contends that the ALJ improperly weighed Dr. Thomsen's opinion. Brown's Mot. at 13, 15–16. As discussed above, Dr. Thomsen found that Brown had marked limitations in terms of his ability to maintain concentration as well as his ability to maintain regular attendance in the workplace. AR 422. The ALJ weighed Dr. Thomsen's opinion as follows:

> I give weight to the opinion of Dr. Thomsen, who evaluated [Brown] at the request of [Brown's] representative in February 2014 to the extent that she assessed that [Brown] has no significant limitation in the ability to understand, remember, and carry out simple instructions and as otherwise consistent with the capacity for unskilled work. To the extent that greater limitations are indicated, they are found to be contradicted by the weight of the evidence with respect to the residual functional capacity for simple routine tasks and are not adopted herein. Dr. Thomsen's opinion was based on a one-time evaluation and appears to be based in large degree upon [Brown's] subjective complaints which have not been found consistent with the record.

AR 30.

To the extent that the ALJ rejected Dr. Thomsen's opinion, the Court finds that the ALJ failed to provide specific and legitimate reasons for doing so. The first reason, namely that Dr. Thomsen's findings are based on a "one-time evaluation," is not a specific and legitimate reason. *Id.* It is worth noting that the ALJ ascribed "substantial weight" to Drs. Gregg and Franco, who did not examine Brown. *Id.* Discounting Dr. Thomsen's findings because they are based on a "one-time evaluation," *id.*, is "legally erroneous" because "[t]he ALJ's rationale would render all examining opinions superfluous, and is contrary to the requirement that the ALJ consider all relevant evidence, including medical opinions of examining doctors." *Thompson v. Berryhill*, No. 17-305 (BAT), 2017 WL 4296971, at *3 (W.D. Wash. Sept. 28, 2017) (citing 20 C.F.R. § 416.945(a), which requires the ALJ to review "all of the relevant medical and other evidence"); *Sorg v. Astrue*, No. C09-5063 (KLS), 2009 WL 4885184, at *8 (W.D. Wash. Dec. 16, 2009) (holding that the ALJ improperly discounted a physician's opinion because it was "based on a one-time evaluation," reasoning that "just because [the physician] saw and evaluated [the] plaintiff one time does not alone invalidate any findings or opinions based thereon, particularly as the Commissioner himself often relies on such one-time evaluations in determining a claimant's disability or lack thereof"); *see also Tomasetti*, 533 F.3d at 1041 (holding that the ALJ is required to consider "all medical opinion evidence," citing 20 C.F.R. § 404.1527(b)).

The second reason, namely that Dr. Thomsen's findings are based in large part on Brown's subjective complaints, is not a specific and legitimate reason to reject Dr. Thomsen's findings. "If a treating provider's opinions are based 'to a large extent' on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating

provider's opinion." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citing *Tomasetti*, 533 F.3d at 1041). "However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Id.* (citing *Ryan*, 528 F.3d at 1199–1200). Here, the ALJ improperly discounted Dr. Thomsen's findings because, in addition to utilizing Brown's self-reports, Dr. Thomsen conducted a battery of tests and based her opinion in large part on those tests. *Id.* at 412–19. Dr. Thomsen also based her findings on her own observations as well as a review of Brown's medical and personal history. *Id.* at 409–412.

Accordingly, the ALJ erred when he failed to provide specific and legitimate reasons for discounting portions of Dr. Thomsen's findings. Nor can this Court conclude this error was harmless, as "the circumstances of the case show a substantial likelihood of prejudice." *McLeod*, 640 F.3d at 888.

### 6. Ahmed El-Sokkary, Psy.D.

Brown argues that the ALJ improperly weighed Dr. El-Sokkary's findings. Brown's Mot. at 13–15. The ALJ "afford[ed] little weight to the 2010 assessment by [Dr. El-Sokkary] in connection with a prior application to the extent [it is] inconsistent with this finding." AR 30. The ALJ reasoned that "Dr. El-Sokkary assessed an ability for simple repetitive tasks but limitations that have not been established for the requisite period, even without considering substantial admitted drug and alcohol use during that prior period." *Id.*

As an initial matter, contrary to the ALJ's assertion, it is not entirely clear that "Dr. El-Sokkary assessed an ability for simple repetitive tasks." *Id.* As discussed above, Dr. El-Sokkary found that Brown would have difficulty in the workplace in terms of his ability to "understand, remember, and perform simple tasks" because Brown "struggled to maintain a sufficient level of concentration, persistence, and pace." AR 276. Furthermore, Dr. El-Sokkary determined that Brown "struggled throughout the evaluation to adequately relate and interact and therefore would have difficulty appropriately interacting with supervisors and co-workers at this time." *Id.* The Commissioner appears to concede that Dr. El-Sokkary's findings are inconsistent with an assessment that indicates Brown is capable of performing simple work. *See* Comm'r's Mot. at 8

32

United States District Court
Northern District of California

("[T]o the extend that Dr. El-Sokkary's opinion was relevant to [Brown's] current disability application, . . . the record evidence supports the ALJ's decision to discount the doctor's opinion that [Brown] lacks the mental functioning capacity to even perform simple work.").

The first reason that the ALJ attributed little weight to Dr. El-Sokkary's opinion, namely that his findings predate the alleged onset date, is a specific and legitimate reason to attribute little weight because, as discussed above, medical opinions that predate the alleged onset date are of "limited relevance." *Carmickle*, 533 F.3d at 1165. It is important to note that the ALJ gave that reason independently of Brown's substance abuse during the time of Dr. El-Sokkary's evaluation because substance abuse is not a specific and legitimate reason to discount a physician's findings. *See Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001) (holding that "an ALJ must first conduct the five-step inquiry without separating out the impact of alcoholism or drug addiction").

Because the ALJ's improper rejection of other medical evidence is sufficient reason to reverse the decision of the Commissioner and remand the matter for further administrative proceedings, the Court need not decide whether the ALJ's characterization of Dr. El-Sokkary's opinion constitutes error even despite the ALJ's permissible decision to afford little weight to it as evidence predating the alleged onset date. The Commissioner is encouraged on remand to consider whether a closer reading of Dr. El-Sokkary's opinions affects the outcome.

The Court also need not reach the ALJ's treatment of evidence from therapist Seth Page and social workers Jeremiah Maller and Kate Wadsworth, although the Commissioner is encouraged to consider their records on remand as well.

### 7. Natalie Aitchinson, M.D.

Brown contends that the ALJ improperly rejected Dr. Aitchinson's findings. Brown's Mot. at 13. Dr. Aitchinson treated Brown in 2009, years before Brown's alleged onset date in 2013. AR 252–55. The ALJ did not mention Dr. Aitchinson in his decision. As discussed above, because Dr. Aitchinson's medical evidence predates Brown's alleged onset date, it is of "limited relevance." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d at 1165. Also as discussed above, an ALJ errs when he fails to consider medical evidence that predates the alleged onset date because he is required to consider all of a claimant's medical evidence. *Williams*, 493 F. App'x at

868 (citations omitted). Accordingly, the ALJ erred in failing to address Dr. Aitchinson's findings. Moreover, the Court cannot "confidently conclude," *see Marsh*, 792 F.3d at 1173, that this error was harmless, as Dr. Aitchinson's discharge summary from Willow Rock Adolescent Center discusses Brown's "new onset of psyohosis [sic]," his violent behavior, and his "poor ability to perform activities of daily living." AR 252–53.

### 8. Luisito M. Roxas, M.D.

Brown also contends that the ALJ erred by disregarding Dr. Roxas's findings. Brown's Mot. at 13. Dr. Roxas saw Brown in 2011, so his findings predate the alleged onset date in 2013. For the reasons discussed above, the ALJ erred when did not mention Dr. Roxas in his decision. Unlike Dr. Aitchinson, however, Dr. Roxas did not provide a diagnosis indicative of disability. Dr. Roxas noted that there was "[n]o evidence of psychosis" while Brown was hospitalized. AR 294. Dr. Roxas further indicated that Brown's "diagnosis is not really clear yet" and that he "need[ed] a psychiatric follow up." *Id.* at 295. Accordingly, the Court concludes that the ALJ's failure to discuss Dr. Roxas's findings in his unfavorable decision was harmless because, even fully crediting Dr. Roxas's testimony, the Court "can confidently conclude that no reasonable ALJ . . . could have reached a different disability determination." *Marsh*, 792 F.3d at 1173 (quoting *Stout*, 454 F.3d at 1055–56).

### 9. Mcheko Graves-Matthews, M.D.

Brown argues that the ALJ erred when he improperly rejected Dr. Graves-Matthews's findings. Brown's Mot. at 13. Dr. Graves-Matthews saw Brown in 2012 while Brown was incarcerated at Santa Rita Jail. AR 510–14, 517. The ALJ did not address Dr. Graves-Matthews's findings in his decision. As discussed above, because this evidence predates the alleged onset date, it is of "limited relevance." *Carmickle,* 533 F.3d at 1165. Also as discussed above, however, an ALJ errs when he fails to consider medical evidence that predates the alleged onset date because he is required to consider all of a claimant's medical evidence. *Williams*, 493 F. App'x at 868 (citations omitted). The Court cannot "confidently conclude," that the ALJ's error of failing to address Dr. Graves-Matthews's findings was harmless, *cf. Marsh*, 792 F.3d at 1173, as Dr. Graves-Matthews treated Brown for an increase in psychiatric symptoms, including paranoia,

anxiety, and hallucinations. *See, e.g.*, AR 510.

* * *

For the reasons discussed above, the Court concludes that the ALJ erred in improperly evaluating, or failing to evaluate, medical evidence from at least Drs. Thomsen, Aitchinson, and Graves-Matthews.

### D.   The ALJ Erred in Discrediting Brown's Testimony

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick*, 157 F.3d at 722 (9th Cir. 1998). "The ALJ's findings, however, must be supported by specific, cogent reasons." *Id.* "In evaluating the credibility of a claimant's testimony regarding subjective [symptoms], an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citation omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112.

"Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Ligenfelter*, 504 F.3d at 1036 (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112; *Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 693 (9th Cir. 2009); *Vasquez*, 572 F.3d at 591–93 (concluding that an ALJ failed to provide "specific, clear, and convincing" reasons to support an adverse credibility determination). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quoting *Lester*, 81 F.3d at 834); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence.").

"In evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). "An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment. However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide specific, cogent reasons for the disbelief." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citations omitted). The ALJ is required to "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id*. (alterations in original; citations omitted). "Where, as here, the ALJ did not find affirmative evidence that the claimant was a malingerer, those reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* (internal quotation marks and citations omitted).

The ALJ satisfied the first step of the two-step inquiry regarding Brown's testimony when he found that Brown's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 28; *Ligenfelter*, 504 F.3d at 1036. Second, because the ALJ did not identify any evidence of malingering, he was required to support his finding that Brown's testimony was not credible with clear and convincing reasons. *Ligenfelter*, 504 F.3d at 1036. The ALJ failed to identify such reasons.

The ALJ determined that "the evidence generally does not support the alleged loss of functioning." AR 30. In support of this determination, the ALJ discussed that Brown has been able to seek employment, obtain a job (although he "was unable to keep the job due to the distance and lack of transportation"), attend Alcoholics Anonymous meetings and social events, go to the gym, enroll in college, and work on obtaining his general equivalency diploma. *Id*. This evidence is insufficient to undermine Brown's complaints.

"While a claimant need not 'vegetate in a dark room' in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1112–13 (citations omitted). Moreover, "[e]ven when those activities suggest some difficulty

functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* (citations omitted). At best, the evidence in this case that the ALJ relies on suggests that Brown has been making steps towards successfully seeking employment. It does not, however, contradict his testimony that he is unable to successfully remain in competitive employment or show that he has made exaggerated claims about his limitations. *See Valentine*, 574 F.3d at 694 (holding that the ALJ provided clear and convincing reasons for rejecting a claimant's testimony because the claimant's activities of daily living showed that "the severity of his limitations were exaggerated").

As discussed above, Brown testified that he had worked on a part-time basis for relatively brief periods of time in restaurants. AR 44–46, 50. He testified that it was "difficult for [him] to focus and that the pace would sometimes be "too fast for [him] to actually concentrate and multitask." AR 45. When work became too difficult for him, even though he was already working on a part-time basis, Brown testified that he would "ask for less hours." *Id.*

In *Garrison v. Colvin*, the Ninth Circuit cautioned against characterizing improved periods of mental health as indicating that a claimant is not disabled:

> Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for the ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding that a claimant is capable of working. . . . Reports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and nature of her symptoms. . . . They must also be interpreted with an awareness that improved functioning while being treated and while limited environmental stressors does not always mean that a claimant can function effectively in a workplace.

*Garrison*, 759 F.3d at 1017 (citations omitted). Accordingly, to the extent that the ALJ relies on a period of improvement, as shown by Brown's ability "to participate in monthly and bi-weekly meetings to improve his overall health and well-being and to research and apply for jobs" as well as Brown's report that "he was going to church, not drinking, and was able to focus and concentrate more than he ever had before," it is insufficient refute Brown's testimony. AR 30–31. While Brown's symptoms may have improved for a period of time, Brown has also experienced periods in which his symptoms have increased, including as recently as April 2016. *See, e.g.*, AR

510 (becoming more symptomatic in November 2012), 548–51(increased symptoms in April 2016).  Lastly, this error was not harmless, as Brown's testimony, if credited, could support a more restrictive RFC than assessed by the ALJ.  *McLeod*, 640 F.3d at 888.

### E. Whether the ALJ Erred at Steps Four and Five

For the reasons discussed above, the ALJ erred when he improperly weighed the medical evidence and discredited Brown's testimony.  Those errors also infect his RFC determination at Step Four as well as his determination at Step Five that significant work exists in the national economy that Brown can perform.  *See, e.g.*, *Lingenfelter*, 504 F.3d at 1040–41 (holding that at an ALJ's RFC determination was not based on substantial evidence because the ALJ failed to provide clear and convincing reasons for rejecting the claimant's testimony and holding that substantial evidence did not support the ALJ's determination at Step Five because the ALJ had relied on an erroneous RFC).  Accordingly, the Court remands for reconsideration of Steps Four and Five as well.

### F. Whether This Court Should Remand for Further Administrative Proceedings or an Award of Benefits

"Usually, '[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'"  *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)).  While the Social Security Act, however, gives courts the power "to affirm, modify, or reverse a decision by the Commissioner 'with or *without* remanding the cause for a rehearing,'" Brown has only requested remand for further administrative proceedings, and it is not clear that any other outcome would be appropriate on this record.  *Id.* (quoting 42 U.S.C. § 405(g)) (emphasis added in *Garrison*); *see* Reply at 13.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Brown's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS this case for further administrative proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 29, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge